IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

MARK TRENTON WILLIAMS PLAINTIFF
ADC# 180488

V. Case No. 4:24-CV-00477-BSM-BBM

LONNELL SEAMSTER, Head Nurse,
Tucker Unit, Well-Path DEFENDANT

**RECOMMENDED DISPOSITION**

The following Recommended Disposition ("Recommendation") has been sent to United States District Judge Brian S. Miller. You may file written objections to all or part of this Recommendation. If you do so, those objections must (1) specifically explain the factual and/or legal basis for your objection; and (2) be received by the Clerk of this Court within 14 days of the date of this Recommendation. If you do not file objections, Judge Miller may adopt this Recommendation without independently reviewing all of the evidence in the record. By not objecting, you may waive the right to appeal questions of fact.

## I. INTRODUCTION

On June 3, 2024, Plaintiff Mark Trenton Williams, a prisoner in the Arkansas Division of Correction ("ADC"), filed a *pro se* Complaint under 42 U.S.C. § 1983, alleging that Defendants violated his constitutional rights. (Doc. 2). After Williams amended his Complaint, (Doc. 9), and the Court screened the Amended Complaint in accordance with the Prison Litigation Reform Act, Williams is proceeding on claims that Lonnell Seamster, an Advanced Practice Nurse ("APN"), was deliberately indifferent to his serious medical

needs by throwing away his medication and denying him a wheelchair. (Docs. 10–11); *see* (Doc. 21 at 1, ¶ 1). Williams is proceeding against APN Seamster in his individual capacity only. (Doc. 11).

APN Seamster filed a Motion for Summary Judgment, (Doc. 19), a Brief in Support, (Doc. 20), and a Statement of Undisputed Facts, (Doc. 21). Williams filed a Response. (Doc. 23).[1] APN Seamster has not filed a reply, and the time to do so has passed. Thus, the issues are ready for disposition.

## II. BACKGROUND[2]

Williams's claims stem from his 15-month incarceration in the ADC's Tucker Unit, *See* (Doc. 9) (Doc. 21-24). On September 22, 2022—shortly after Williams transferred to the Tucker Unit—he was seen for a chronic-care visit by a non-party doctor. (Doc. 21 at 1, ¶ 3) (Doc. 21-2). At the time, Williams used a wheelchair and had a history of COPD, hypertension, and vascular disease. (Doc. 21 at 1, ¶ 2). After Williams reported that he no longer took his blood-pressure medication, the doctor discontinued the prescription but noted that Williams's blood pressure should be followed closely. *Id.* at ¶ 3; (Doc. 21-2). The doctor continued Williams's other chronic-care medication; ordered labs and a follow-up visit; and advised Williams that he should eat protein, hydrate, and elevate his legs when

[1] Because Williams did not file a response to APN Seamster's Statement of Undisputed Facts, all of the material facts in APN Seamster's Statement of Undisputed Facts are deemed admitted. LOCAL RULE 56.1(c). *See also* (Doc. 22) (informing Williams of Local Rule 56.1(c)).

[2] These facts are sourced from Williams's operative and verified Amended Complaint, (Doc. 9), the admitted Statement of Undisputed Facts, (Doc. 21), and the supporting exhibits, which include Williams's ADC medical records and a doctor's affidavit, (Doc. 21-1 to 21-24).

lying down or sitting. (Doc. 21-1 at 1, ¶ 3); (Doc. 21-2). Although the doctor noted Williams's use of a wheelchair, he did not enter an order for a wheelchair. (Doc. 21-1 at 1, ¶ 3); (Doc. 21-2).

In October 2022, Williams received treatment for shingles and back pain. (Doc. 21 at 2, ¶ 5) (Doc. 21-3). When Williams was seen for a shingles follow-up on November 3, 2022, APN Seamster noted that Williams was in a wheelchair without an active prescription for such, was full weight-bearing, and had full range of motion in both legs. (Doc. 21-5). APN Seamster concluded that there was "[n]o indication for a wheelchair at this time." *Id.* APN Seamster did not discontinue any medications and, at that time, did not discontinue the wheelchair. *See id*.

At Williams's chronic-care follow-up on December 1, 2022, APN Seamster questioned Williams about his need for a wheelchair. (Doc. 21-6 at 1). Williams responded that he needed the wheelchair due to his vascular disease, explaining that, "When I stand[,] my legs swell up and bust." *Id.* APN Seamster again noted that Williams was full weight-bearing and had full range of motion in all extremities, *id.*, but recorded bilateral weakness in Williams's lower extremities. *Id.* at 1–2. APN Seamster discontinued the wheelchair, prescribed a walker, and recommended exercise for Williams's vascular disease. *Id.* at 2. APN Seamster did not discontinue any medications. *See id.* at 1–2.

On February 7, 2023, APN Seamster saw Williams for complaints of nerve pain. (Doc. 21-6 at 1). APN Seamster noted that Williams had a "[c]oordinated walk with walker." *Id.* He added ibuprofen but otherwise continued Williams's medications. *Id.*

On February 28, 2023, APN Seamster saw Williams for complaints of a rash. (Doc. 21-7). APN Seamster discontinued Williams's skin cream (zinc oxide), and, instead, prescribed hydrocortisone cream and a prednisone burst. *Id.* He noted that Williams had a "[c]oordinated walk with normal gait." *Id.* He reviewed and continued Williams's medications. *Id.*

On April 9, 2023, Williams had a syncopal episode[3] and was transferred to the Jefferson Regional Medical Center ("JRMC"). (Doc. 21 at 3, ¶ 10) (Doc. 21-1 at 2, ¶ 6). Williams was treated for orthostatic hypotension, which "is a decrease in blood pressure following standing up from sitting or lying." (Doc. 21-1 at 2, ¶ 6). After a five- to six-day hospital stay, JRMC discharged Williams with a recommendation that midodrine be added to Williams's medication regimen. (Doc. 21-1 at 2, ¶ 6) (Doc. 21-8).

APN Seamster ordered the midodrine on April 17, 2023, but Dr. Chris Horon reviewed the order and wrote "read black box warning….not sure this patient needs this drug." (Doc. 21 at 3, ¶ 10) (Doc. 21-9). On April 18, APN Seamster had a follow-up visit with Williams regarding the JRMC stay and discharge instructions. (Doc. 21-9). Williams denied "dizziness, nausea, vomiting, lightheadedness, or syncopal episode." *Id.* APN Seamster noted that Williams continued to have a "[c]oordinated walk with walker." *Id.* He recommended orthostatic blood-pressure checks, adequate water and sodium intake, and that Williams "[t]ransition slowly from supine to sitting to standing." *Id.* He ordered a follow-up visit in two weeks for evaluation of Williams's blood pressure and did not

[3] *See Syncopal* & *Syncope*, Stedman's Medical Dictionary 875530 & 875540 (2014) ("Loss of consciousness and postural tone caused by diminished cerebral blood flow.").

provide the prescription for midodrine and another prescription, fludrocortisone. *Id.* Williams's medications were otherwise continued. *Id.*

On May 4, 2023, Williams reported to the infirmary with complaints of "nerve pain with the feeling of stinging and needles to stomach and down right leg." (Doc. 21-11). He said that ibuprofen was offering no relief. *Id.* APN Seamster discontinued the ibuprofen and added Tylenol. *Id.* Williams's medications were otherwise unchanged, and he continued to have a "[c]oordinated walk with walker" and "[t]ransfers without complications." *Id.*

On August 10, 2023, APN Seamster conducted a physical examination of Williams. (Doc. 21-14 at 2–4). APN Seamster noted that Williams had bilateral weakness in his lower extremities, but he discontinued Williams's walker prescription in favor of a cane. *Id.* at 3. APN Seamster provided Williams with duty restrictions and additional medication for his skin condition. *Id.* Williams's medications were otherwise continued. *Id.*

On September 26, 2023, APN Seamster saw Williams for a chronic-care visit. (Doc. 21-16 at 2). Williams had an uncoordinated walk using his cane with his left hand. *Id.* But he denied having swollen extremities or other complaints. *Id.* APN Seamster added hydrochlorothiazide and otherwise continued Williams's medications. *Id.* Between Williams's September 26 and October 26, 2023 visits with APN Seamster, Williams complained of leg swelling, rash, and pain and was provided new medication, increased pain medication, and compression socks by non-party providers. *Id.* at 1; (Doc. 21-17 at 1–2).

At the October 26 visit, Williams complained that the newly-prescribed medication was not working for his pain. (Doc. 21-18). APN Seamster encouraged Williams to try the increased pain medication dosage for at least four to six weeks. (Doc. 21-18). He renewed Williams's Tylenol prescription, issued TED hose for the leg swelling, and recommended Williams elevate both legs three times a day. *Id.* Williams's medication was otherwise continued. *Id*. And it was noted that Williams had a "[c]oordinated walk with cane" and "transferr[ed] without complication." *Id.*

Two days later, October 28, Williams presented to sick call, claiming that APN Seamster was supposed to see about him receiving a shower chair. (Doc. 21-19). Williams complained that he was not sleeping well at night because of pain and requested stronger pain medication, an extra mattress, and potassium for his muscle cramps and spasms. *Id.* The nurse consulted with APN Seamster, who advised that Williams's labs indicated no need for potassium. (Doc. 21 at 5, ¶ 19) (Doc. 21-19). APN Seamster also continued to advise that Williams should wait to monitor the effects of the recently increased pain medication. (Doc. 21 at 5, ¶ 19) (Doc. 21-19).

On October 31, 2023, APN Seamster saw Williams about his request for a shower chair and shower shoes. (Doc. 21 at 5, ¶ 20) (Doc. 21-20 at 1). Williams reported that he was having trouble standing when showering but denied falling or injury. (Doc. 21-20 at 1). He also stated that he was unable to wear the state-issued shoes because of swelling in both feet. *Id.* Williams had decreased strength in his legs. *Compare* (Doc. 21-20 at 1) ("Strength:…BLE 3/5") *with* (Docs. 21-6, 21-11, 21-17, 21-18) ("Strength:…BLE 4/5"). But APN Seamster noted that Williams continued to have a coordinated gait with the cane

and transferred without complication. (Doc. 21-20 at 1). He concluded that there was "[n]o medical indication for a shower chair or medical shoes at this time." *Id.* Williams's medications were renewed and continued. *Id.* at 1–2.

On November 3, 2023, Williams was escorted to the infirmary in a wheelchair. (Doc. 21-21). He asked to see the doctor "ASAP" and told the nurse that he could barely walk and had almost fallen several times. *Id*. He blamed the pain in his back on a pinched nerve in his left leg and told the nurse he had been on gabapentin in the past but "was taken off [it] when he went to another unit." *Id*. Williams relayed that he had to "hold on to something to be able to get to and from the bathroom." *Id*. The nurse had Williams attempt to use his walker,[4] but Williams "wasn't able to put his left leg down due to feeling needles down his whole leg" and did not even attempt to move his left foot. *Id*. The nurse called APN Seamster, who denied Williams a wheelchair script and advised that Williams should continue with his current medication and walker. *Id.*

On November 7, Williams refused to be evaluated at sick call. (Doc. 21 at 5, ¶ 21). According to the medical records, he did so because his "blood pressure fellout [sic] again." (Doc. 21-21) (all caps omitted). He complained that he could not get up, had been "bedfast" for two days, and "thanks 2 Seamster I abou[t] died." *Id.* On November 21, Williams had a chest x-ray that revealed "no evidence of acute cardiopulmonary disease." (Doc. 21 at 6, ¶ 22) (Doc. 21-22 at 2).

[4] It is unclear from the record when Williams transitioned from a cane back to a walker.

On November 30, Williams presented to sick call with complaints of swelling and pain in both legs. (Doc. 21-23 at 2). Williams continued to exhibit decreased strength in his legs, and APN Seamster noted that Williams had "[u]ncoordinated gait [with] walker" and was dragging his left leg. *Id*. APN Seamster increased Williams's pain medication, added Lasix IM, otherwise continued Williams's medication, and provided Williams a wheelchair script for three days. *Id.*

On December 4, 2023, Williams fell and broke his hip. (Doc. 21 at 6, ¶ 24) (Doc. 21-23 at 1). He was transferred to the University of Arkansas for Medical Sciences ("UAMS"), where he received hip surgery. (Doc. 21 at 6, ¶ 24) (Doc. 21-23 at 1). On December 8, 2023, Williams was transferred to the ADC's Wrightsville Unit, where he was no longer under the care of APN Seamster. (Doc. 21 at 6, ¶¶ 24–25) (Doc. 21-24).[5]

In support of his Motion for Summary Judgment, APN Seamster submits the affidavit of a family-practice physician, Dr. Mahlon Maris. (Doc. 21-1). Dr. Maris states that he reviewed Williams's medical records from September 2022 to December 2023 (the entirety of Williams's incarceration at the Tucker Unit and under APN Seamster's care) and that, based on his education, training, and experience, he believes "that the medical

[5] In his Amended Complaint, Williams states that he was sent to the Wrightsville Unit *before* being sent to UAMS. (Doc. 9 at 5). Williams's timeline and allegations are unclear, but he also appears to suggest that he broke his hip sometime before his December 8, 2023 transfer, and it was only caught and treated after the Wrightsville Unit doctor evaluated Williams. *Id.* Williams reiterates this position in his unverified Response. (Doc. 23 at 1). However, Willims has produced no evidence to support this allegation and, thus, has not created a genuine dispute of material fact. *See Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986) (a dispute is "'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party"). Moreover, by failing to respond to APN Seamster's Statement of Undisputed Facts, Williams has admitted that he fell and broke his hip on December 4, 2023—the same day he was transferred to UAMS. (Doc. 21 at 6, ¶ 24). LOCAL RULE 56.1(c).

care and treatment provided to Mr. Williams related to his blood pressure management and wheelchair use in 2022 and 2023 was appropriate, adequate, and timely." *Id.* at 3, ¶ 9.

More specifically, Dr. Maris opines that "it was appropriate to treat Mr. William's orthostatic hypotension with life-style modifications and monitoring." (Doc. 21-1 at 2, ¶ 7). He also notes that, because of the adverse side effects, midodrine "should only be utilized if hypotension is not able to be controlled and severely restricts a patient's Activities of Daily Living." *Id.* at 2–3, ¶ 7. In his opinion, Williams's "blood pressure was appropriately monitored and controlled, and it was an appropriate clinical decision to not administer midodrine." *Id.* at 3, ¶ 7. As for the discontinuation of Williams's wheelchair, Dr. Maris opines that "[i]t was appropriate for Seamster to discontinue use of the wheelchair and order a walker to assist Mr. Williams in strength building and mobility." *Id.* at 3, ¶ 9.

## III. DISCUSSION

APN Seamster contends that he is entitled to summary judgment on Williams's medical-deliberate-indifference claim because the undisputed facts show "the care and treatment provided to Mr. Williams by the medical staff, including Lonnell Seamster, related to his blood pressure and wheelchair use from September 2022 to December 2023 was adequate and appropriate." (Doc. 20 at 4–5). APN Seamster specifically argues that it was "appropriate" for him "to treat Mr. Williams' orthostatic hypotension with life-style modifications and monitoring" and "discontinue Mr. Williams' use of a wheelchair" and that he "properly evaluated . . . and transitioned Mr. Williams to a walker and eventually a cane." (Doc. 20 at 4).

In his unverified Response, Williams argues that almost everything APN Seamster said was a complete lie. (Doc. 23 at 1). He states that Seamster threw away all of his heart medication; at some unspecified point, he suffered from congestive heart failure; he just had another heart attack; and his hip is still broken. (Doc. 23 at 1). He claims "this all goes back to negelance [sic] on Seamster's part." (Doc. 23 at 1–2). For the reasons set forth below, the Court recommends that APN Seamster's Motion for Summary Judgment be granted.[6]

"The Eighth Amendment prohibition on cruel and unusual punishment extends to protect prisoners from deliberate indifference to serious medical needs." *A.H. v. St. Louis County, Mo.*, 891 F.3d 721, 726 (8th Cir. 2018). To prevail on his medical-deliberate-indifference claim against APN Seamster, Williams must establish that (1) he had an objectively serious medical need; and (2) APN Seamster knew of but deliberately disregarded that need. *Cannon v. Dehner*, 112 F.4th 580, 586 (8th Cir. 2024), *cert. denied*, 145 S. Ct. 1149 (2025).

[6] Summary judgment is appropriate when the record demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Anderson*, 477 U.S. at 249–50 (1986). The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex*, 477 U.S. at 323. Thereafter, the nonmoving party must present specific facts demonstrating that there is a material dispute for trial. *See* FED. R. CIV. P. 56(c); *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). "Courts must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party." *Brand v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 934 F.3d 799, 802 (8th Cir. 2019) (citing *Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 216 (2015)).

### A. Serious Medical Need

"An objectively serious medical need is one that either has been diagnosed by a physician as requiring treatment, or is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Dalen v. Harpstead*, 123 F.4th 900, 904 (8th Cir. 2024) (cleaned up). The serious-medical-need inquiry is an in-depth analysis that may turn on such issues as the timing of the diagnosis compared to the alleged inadequate treatment. *See id.* (finding that a diagnosis made five months prior to incarceration did not satisfy the serious-medical-need standard); *see also Cannon*, 112 F.4th at 586.

It is undisputed that, when Williams transferred to the Tucker Unit in September 2022, his "medical history was significant for COPD, hypertension and vascular disease." (Doc. 21 at 1, ¶ 2). And, as early as April 9, 2023, Willams was diagnosed with orthostatic hypotension, for which treatment was recommended. (Doc. 21 at 3, ¶ 10) (Doc. 21-1 at 2, ¶ 6). Thus, the Court finds that those conditions constituted serious medical needs.[7] The inquiry then becomes whether APN Seamster deliberately disregarded those needs.

### B. Deliberate Disregard

A plaintiff can show deliberate disregard or "deliberate indifference in the level of care provided in different ways," including by "showing grossly incompetent or inadequate care, showing a defendant's decision to take an easier and less efficacious course of

---

[7] To the extent Williams may be attempting to raise his broken hip as a serious medical need, he has admitted that he broke his hip on December 4, 2023, and APN Seamster did not treat him after that date. *See supra* n.5. Thus, Williams's broken hip is irrelevant to the analysis of whether APN Seamster was deliberately indifferent. Put differently, Williams has adduced no evidence suggesting he had a broken hip at the time he was seen and treated by APN Seamster. Consequently, he cannot show that APN Seamster was deliberately indifferent to that need.

treatment, or showing a defendant *intentionally delayed* or denied *access to medical care*." *Dantzler v. Baldwin*, 133 F.4th 833, 846 (8th Cir. 2025) (internal quotation marks and citation omitted). However, "[t]he prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation." *Dalen*, 123 F.4th at 904 (citation omitted). And a defendant "is only liable for his or her own misconduct." *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009); *Mitchell v. Saint Louis County, Mo.*, 160 F.4th 950, 957 (8th Cir. 2025).

In the Amended Complaint, Williams alleged that APN Seamster: (1) "took away [his] heart meds"; (2) threw away the medication recommended by JRMC; and (3) "wouldn't let [him] have a wheelchair." (Doc. 9 at 4–5). The Court will discuss each allegation, in turn.

<u>Heart Medication</u>. After a thorough review of Williams's care under APN Seamster, there is no apparent evidence of APN Seamster discontinuing Williams's "heart medication." Indeed, APN Seamster most often "continued" Williams's medications, *see, e.g.,* (Doc. 21-5) (Doc. 21-6 at 1, 2) (Doc. 21-8 at 1), and appears to have only discontinued prescriptions for zinc oxide skin cream, (Doc. 21-8 at 2); ibuprofen when adding Tylenol, (Doc. 21-11); or a wheelchair when providing a walker, (Doc. 21-6 at 2), and a walker when providing a cane, (Doc. 21-14 at 3).

To the extent Williams may be complaining about the discontinuation of his blood-pressure medication, the record reveals that medication was discontinued by a non-party provider when Williams reported he was no longer taking it. (Doc. 21-2). And, regardless, Dr. Maris has opined that all medication changes for Williams's hypertension and blood

pressure during the relevant time were "appropriate, adequate, and timely." (Doc. 21-1 at 2–3, ¶¶ 5, 9). "[I]n the face of medical records indicating that treatment was provided and physician affidavits indicating that the care provided was adequate, an inmate cannot create a question of fact by merely stating that he did not feel he received adequate treatment." *Cejvanovic v. Ludwick*, 923 F.3d 503, 508 (8th Cir. 2019) (cleaned up) (quoting *Dulany v. Carnahan*, 132 F.3d 1234, 1240 (8th Cir. 1997)). Because Williams has adduced no evidence that APN Seamster discontinued his heart medication—or even that any such discontinuation constituted inadequate medical care—APN Seamster is entitled to summary judgment on that claim.

Medication Recommended by JRMC. In his Amended Complaint, Williams did not clarify which medication was prescribed by the providers at JRMC, only that APN Seamster allegedly threw the medication away. (Doc. 9 at 4). Upon review of the medical records, it appears that Williams takes issue with the decision not to provide the midodrine recommended by the JRMC doctors. *See* (Doc. 21-1 at 2, ¶ 6) (Doc. 21-8).

Again, this appears to have been a decision made by a non-party provider, Dr. Horan, not APN Seamster. *See* (Doc. 21-1 at 2, ¶ 6) (Doc. 21-8). After APN Seamster ordered the midodrine, Dr. Horan wrote "read black box warning . . . not sure [Williams] needs this drug."[8] (Doc. 21-8 at 1). To the extent APN Seamster implemented Dr. Horan's recommendation and withheld the midodrine, Dr. Maris has opined it was "an appropriate

[8] "Special problems, particularly those that may lead to death or serious injury, may be required by the FDA to be placed in a prominently displayed box. This prominently displayed box is commonly referred to as a 'black box.'" *Ehlis v. Shire Richwood, Inc.*, 367 F.3d 1013, 1019 n.5 (8th Cir. 2004) (cleaned up).

clinical decision to not administer midodrine." (Doc. 21-1 at 2–3, ¶ 7). Williams has come forward with no evidence to controvert that opinion. *Cejvanovic*, 923 F.3d at 508; *see also Gregory v. City of Rogers, Ark.*, 974 F.2d 1006, 1010 (8th Cir. 1992) (to withstand summary judgment, plaintiff must present sufficient, probative evidence for a reasonable jury to return a favorable verdict based on more than mere speculation or conjecture). Accordingly, APN Seamster is also entitled to summary judgment on Williams's medical-deliberate-indifference claim based on the denial of midodrine.

Wheelchair. Williams's final complaint is that APN Seamster would not let him have a wheelchair. (Doc. 9 at 5). It is unclear from the allegations whether Williams takes issue with APN Seamster first discontinuing Williams's wheelchair use on December 1, 2022, (Doc. 21-6 at 1), or with APN Seamster declining to give him a wheelchair on November 3, 2023, (Doc. 21-21). Either way, Dr. Maris has again opined that the medical care provided to Williams, as it relates to the "wheelchair use in 2022 and 2023 was appropriate, adequate, and timely." (Doc. 21-1 at 3, ¶¶ 8–9). And Williams has provided no contrary evidence. So, APN Seamster is also entitled to summary judgment on Williams's medical-deliberate-indifference claim based on the denial of a wheelchair.

## IV. CONCLUSION

In sum, APN Seamster has come forward with evidence showing he is entitled to summary judgment, and Williams has failed to provide sufficient, probative evidence in return. Thus, based on the evidence before the Court, no reasonable jury could find that APN Seamster was deliberately indifferent to Williams's serious medical needs, and APN Seamster is entitled to judgment as a matter of law.

IT IS THEREFORE RECOMMENDED THAT:

1. Seamster's Motion for Summary Judgment, (Doc. 19), be GRANTED.

2. Williams's deliberate-indifference claims against APN Seamster—based on the discontinuation of heart medication, the denial of JRMC-recommended medication, and the denial of a wheelchair—be DISMISSED with prejudice.

3. Judgment be entered accordingly.[9]

DATED this 4th day of August, 2026.

Benecia Moore
UNITED STATES MAGISTRATE JUDGE

[9] All other claims were previously dismissed without prejudice for failure to state a claim for relief. (Doc. 11).